Kenneth C. **WILLIAMS** et al., Appellants,

v.

**W. M. A. TRANSIT COMPANY,**
Appellee.

No. 24485.

United States Court of Appeals,
District of Columbia Circuit.

Argued June 3, 1971.

Decided June 30, 1972.

Mr. Stanley O. Sher, Washington, D. C., with whom Messrs. Michael G. Kushnick and Alan S. Davis, Washington, D. C., were on the brief, for appellants.

Mr. William B. Devaney, Washington, D. C., with whom Mr. Stanley H. Kamerow, Washington, D. C., was on the brief, for appellee.

Messrs. C. Francis Murphy, Corp. Counsel for the District of Columbia, Richard W. Barton and Leo N. Gorman,

Asst. Corp. Counsels, filed a brief on behalf of the District of Columbia, as amicus curiae urging reversal.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

LEVENTHAL, Circuit Judge:

■ This is a class action by 92 bus drivers, for themselves and others similarly situated, against the WMA Transit Company, their employer, for its failure to pay overtime compensation for hours worked in excess of 40 hours per week, claimed to be required by the District of Columbia Minimum Wage Act of 1966 (D.C.Act).[1] We need not and do not consider the Company's claims that it did not work its men overtime, and that it obtained a release. The case comes to us in the posture of a summary judgment entered by the Court of General Sessions (now Superior Court) sustaining the contention that the D.C.Act does not apply to these employees, which the District of Columbia Court of Appeals (DCCA) affirmed.[2]

While this case involves the construction of the D.C.Act, its sound disposition requires consideration of the interrelation between the D.C.Act and the Federal statutory provisions relating to minimum compensation and maximum hours for bus drivers in interstate commerce. We reverse and remand.

A. *Material Facts*

The material facts[3] may be briefly stated as follows:

The Company is a Delaware corporation with offices on the Maryland side of the District boundary. The Company has no facilities in the District of Columbia, but it stations dispatchers on the streets in the District, and its buses periodically wait at certain locations in the District. It operates three types of service. It runs a Government contract operation which is local within the District but relatively minor. It runs a charter operation—accounting for 19% of driver hours. This is essentially a metropolitan area service. Approximately 60% of the charter groups are picked up in and returned to the District of Columbia, though the Company stresses that the drivers and buses start from and return to garages in Maryland.

The most significant part of the Company's business is its operation of 84 regular bus routes, of which 79 enter the District of Columbia. More than 50% of the regular route passengers are interstate passengers, either picked up in Maryland and discharged in the District, or vice versa. Some passengers are both picked up and discharged in the District, others are Maryland local passengers. The Company receives a cash subsidy from the District of Columbia for transporting D.C. public school children on its routes.

The Company requires its bus drivers to have both D.C. and Maryland licenses. The Company basically does not segregate its drivers according to particular routes or places of operation. They may be asked to move from route to route. The Company made a time study and from this estimates that on the average its bus drivers spend 38% of total pay time within the District. The underlying data show some drivers with workweeks spent primarily (more than 50%) in the District of Columbia.

B. *Discussion of Statutory Provisions*

1. *District Act*

The District of Columbia Minimum Wage Act implements its spacious pur-

---

1. D.C.Code 1967, § 36–401 et seq., the D.C.Act, became effective Feb. 1, 1967. This Act amended the District of Columbia Minimum Wage Law of September 19, 1918, D.C.Code 1961, § 36–401 et seq., so as to expand coverage to men and to provide for overtime compensation, *inter alia.*

2. Williams v. WMA Transit Co., 268 A.2d 261 (1970).

3. Derived from plaintiffs' statement of uncontested material facts except where objection was noted either in the trial court or in defendant's brief on appeal (which conceded that the statement of facts in appellants' brief was generally correct, except as to items specially noted).

pose,[4] and its specific provisions requiring payment of minimum wages, and overtime compensation, at time and one-half the regular rate, for employees worked longer than 40 hours per week,[5] with broad coverage provisions. The basic definitions of "employer" and "employee" are not qualified. See D.C.Code § 36–402:

As used in this subchapter—

\* \* \* \* \* \*

(3) The term "employ" includes to suffer or permit to work.

(4) The term "employer" includes any individual, partnership, association, corporation, business trust, or any person or group of persons, acting directly or indirectly in the interest of an employer in relation to an employee

4. D.C.Code § 36–401:
(a) The Congress hereby finds that there are persons employed in some occupations in the District of Columbia at wages insufficient to provide adequate maintenance and to protect health. Such employment impairs the health, efficiency, and well-being of the persons so employed, constitutes unfair competition against other employers and their employees, threatens the stability of industry, reduces the purchasing power of employees, and requires, in many instances, that their wages be supplemented by the payment of public moneys for relief or other public and private assistance. Employment of persons at these insufficient rates of pay threatens the health and well-being of the people of the District of Columbia and injures the overall economy.

5. D.C.Code § 36–403(b)(1)(B):
[No employer shall employ any of his employees] for a workweek longer than forty hours . . ., unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

6. (a) The minimum wage and overtime provisions of section 36–403 shall not apply with respect to—
(1) Any employee employed in a bona fide executive, administrative, or professional capacity, or in the capacity of outside salesman (as such terms are defined by the Secretary of Labor under the Fair Labor Standards Act of 1938); or

. . . .

(5) The term "employee" includes any individual employed by an employer

. . . .

As passed in 1966 the D.C.Act juxtaposed its broad coverage definitions with exemption from overtime requirements for seven groups of employees—including e. g., "any employee employed by a railroad." These provisions, contained in § 36—404 of the D.C.Code, in subsectoins (a)(1) and (2), and (b)(1)–(5), are not applicable to bus drivers.[6]

## B. Federal Legislation

To ascertain relevant legislative intent we must, as will appear, consider provisions in Federal legislation. The D.C. Act was patterned on the Fair Labor

(2) any employee engaged in the delivery of newspapers to the home of the consumer.
(b) The overtime provisions of section 36–403(b)(1) shall not apply with respect to—
(1) any employee employed as a seaman;
(2) any employee employed by a railroad;
(3) any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trailers, or trucks . . .
(4) any employee employed primarily to wash automobiles by an employer
. . .
(5) any employee employed as an attendant at a parking lot or parking garage.

\* \* \* \* \*

In brief and at argument plaintiffs leaned on an exemption provision, added to 36 D.C.Code 404(b) on January 15, 1971 (P.L. 91–650) with respect to employees of bus companies, as subsection (6). This statutory exemption provision purported to be effective as of 1967, but subsequent to submission of this case, on December 15, 1971, this law was repealed (P.L. 92–196), with legislative history making clear that Congress intended to avoid affecting court litigation. See Cong.Rec. S. 21194, December 10, 1971. We find this short-lived provision of little help as a guide to legislative intent concerning the meaning of the coverage provisions.

Standards Act of 1938, as amended, (FLSA) wherein Congress sought to ameliorate conditions found detrimental to the well-being of workers in interstate commerce or the production of goods therefor, by requirements of minimum wages and overtime compensation. In 29 U.S.C. § 207, Congress provided for maximum hours in the work week, with time-and-a-half for overtime, subject to certain exemptions and qualifications. See 29 U.S.C. § 213. Section 213 sets forth a number of exemptions which are the same as those later incorporated into the D.C.Act—for administrative, executive, and professional employees, seamen, railway employees, automobile servicemen and salesmen. Omitted from the D.C.Act is the provision in 29 U.S.C. § 213(b)(1) containing an exemption from overtime requirements as to any employees with respect to whom the ICC (now the Secretary of Transportation) has the power to set maximum hours, a provision applicable of course to employees of common carriers by motor in interstate commerce.[7]

Another pertinent provision appears in 29 U.S.C. § 218:

> No provision of this chapter or of any order thereunder shall excuse non-compliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter * * *.

This section expressly contemplates that workers covered by state law as well as FLSA shall have any additional benefits provided by the state law—higher minimum wages; or lower maximum workweek. By necessary implication it permits state laws to operate even as to workers exempt from FLSA.

C. *Rulings of Statutory Interpretation*

1. In ascertaining the intent of Congress, we give great weight to the fact that in the 1966 D.C.Act, which was modeled on the FLSA,[8] Congress inserted exemptions from the overtime compensation requirements for seven classes of employees, including the substance, and indeed language, of exemption provisions of FLSA, but omitted the exemption provision set forth in FLSA, § 213 (b)(1), for employees as to whom the ICC has power to set maximum hours. That exemption, if available, would extend to employees whose duties affect safety in interstate commerce even though only 3% of their time is spent in interstate commerce. Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947). Another part of the statutory pattern before us is the provision of the D.C.Act specifically exempting employees of railroads, which compete with buses and trucks. We discern a reasonably clear pattern of intent to withhold from the D.C.Act any exemption for employees, of bus and truck companies, merely because they are subject to ICC regulation due to hours in interstate operations.

---

7. See 29 U.S.C. § 213:
   (b) The provisions of section 207 of this title shall not apply with respect to—
      (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of section 304 of Title 49 . . . .
   49 U.S.C. § 304(a) makes it the duty of the ICC
      (1) To regulate common carriers by motor vehicle as provided in this chapter, and to that end the Commission may establish reasonable requirements with respect to . . . qualifications and maximum hours of service of employees, and safety of operation and equipment.
   The functions were transferred from the ICC to the Secretary of Transportation by P.L. 89–670, 80 Stat. 931, October 15, 1966.

8. See, *e. g.*, 111 Cong.Rec. 14860 (June 28, 1965) (Mr. Broyhill refers to the "careful consideration of the Federal Act"); 112 Cong.Rec. 749 (January 20, 1966) (Senator Morse points out that the FLSA was followed in drafting the District bill).

Our view is in accord with an opinion of the D.C.Corporation Counsel, March 17, 1969, which is in the record. As to rulings of other states,[9] we are advised of a similar ruling, of August 7, 1970, by Maryland's Attorney General, which states that this is also the view obtained orally from the General Counsel of the U.S. Department of Labor.[10] The only other ruling, made in 1966 by Maine's Attorney General concludes that the exemption in 29 U.S.C. § 213(b)(1) is applicable to the states, but it rests on premises which are doubtful if not erroneous,[11] as will appear from the next section of this opinion.

2. The trial judge held the D.C.Act inapplicable to the Company's bus drivers on the ground that (1) the Federal provisions clearly establish that "among Federal Agencies only the Department of Transportation has authority to regulate overtime pay of drivers employed by an interstate carrier," and (2) the D.C.Act is "purely local in scope and nature" and is inapplicable to this case in view of "the doctrine of federal supremacy in matters concerning interstate commerce."

We see relatively little significance for present purposes in the fact that Congress centralized responsibility in ICC, now DOT, as "among Federal agencies," for this provision, in 29 U.S.C. § 213, was to obviate conflicting determinations as to the content of the Federal require-

9. By memorandum of June 25, 1971, we asked counsel to file supplementary memoranda on the following questions:

(1) Whether any court decisions or administrative rulings exist concerning the applicability of State laws relating to minimum wage, overtime, or maximum hours, or similar provisions, where employees work in more than one State. If so, as respects overtime hours, whether and—if so—how the total number of overtime hours are allocated between the two States, and what rules are applicable if the two States have different definitions of what constitutes overtime.

(2) Whether there are any judicial, administrative or executive rulings under State Minimum Wage statutes—containing no express exemption for employees subject to Interstate Commerce Commission regulations—on the question of whether the exemption in Section 13(b)(1) of the Fair Labor Standards Act (29 U.S.C. § 213(b)(1)) implies that such employees are exempt from overtime pay provisions of such State statutes.

Plaintiffs' counsel made inquiry of the 48 continental states and received replies from 29 states. The only two rulings from these states which were pertinent were those made by the Attorney General of Maryland and the Attorney General of Maine, referred to in fns. 11 and 12.

10. The ruling of the Maryland Attorney General, made to the Maryland Department of Labor and Industry, and digested in CCH Labor Law Reporter, State Laws, vol. 3, ¶ 49,997.27, states in pertinent part:

"We believe that reasonable and proper construction of both the FLSA and the Maryland Wage and Hour Law includes the following:

\* \* \* \* \*

"3. Where the employment is FLSA-exempt, but is not exempted by the provisions of the Maryland Wage and Hour Law, the employee is covered by the Maryland law.

"4. Where the employment is exempted from the provisions of the FLSA, but is subject to the jurisdiction of one or more other federal agencies, if the Maryland law has higher standards or provides additional or superior benefits, then the employment would be subject to the provisions of the Maryland Wage and Hour Law."

In 1971, Maryland amended its law so as to incorporate the 213(b)(1) exemption see Md.Laws 1971, ch. 709, effective July 1, 1971.

11. The opinion, digested tersely in 1966 CCH Labor Law Reporter State Laws, ¶ 49,726, is before us. Its principal premise is that the authority of the ICC prohibits state regulation of hours of employment, as to which see the discussion below of *Welch*.

The other premise is that the state's purpose in overtime wages is to protect the health of employees, which is also the concern of the ICC. Over and above the difference in emphasis for the ICC, which focuses on protection of the public, overtime compensation provisions—which do not limit hours worked—have the economic purpose of imposing cost burdens on the employer in order to give job opportunities to other workers.

ment.[12] That is a different matter from the issue whether or to what extent Congress intended to permit State or District law to apply to bus drivers subject to ICC-DOT authority. We have already noted powerful indicators that Congress did so intend—the provision in 29 U.S.C. § 218 permitting state law to extend benefits to employees given lesser benefits or none by FLSA; and the failure of the 1966 D.C.Act to include § 213(b)(1) in the exemptions copied from FLSA. In contrast, the possibility of Congressional intent to prohibit D.C. coverage of interstate drivers would have to suppose that Congress was content with silence and reliance on the consequences of Federal supremacy doctrine. While we agree with the DCCA that in the D.C.Act Congress did not purport to be exercising power that would be unavailable to the states,[13] state power is not negatived by the doctrine of federal pre-emption.

If the states are pre-empted by Federal authority, it must be as a result of 49 U.S.C. § 304. The mere vesting of jurisdiction in the ICC to control hours of bus drivers in interstate commerce does not necessarily exclude all state authority to legislate on drivers' wages. As to the case law, we may put to one side the decisions [14] stressed by the Company, that establish the breadth of the employees subject to ICC regulatory jurisdiction under 49 U.S.C. § 304. And all that was held in Southland Gasoline Co. v. Bayley, 319 U.S. 44, 63 S.Ct. 917, 87 L.Ed. 1244 (1943) is what is plain

from the enactments, that ICC is the only Federal agency with jurisdiction over such employees, and that FLSA is inapplicable to the employees subject to the jurisdiction of the ICC, whether or not exercised.

When we come to the issue of concurrent State power, the precedent that affords illumination is Welch Co. v. New Hampshire, 306 U.S. 79, 59 S.Ct. 438, 85 L.Ed. 500 (1939), which involved a New Hampshire statute that made it unlawful for a driver of a truck on New Hampshire highways to operate his vehicle for more than twelve consecutive hours. The Court assumed without deciding that this state regulation would be superseded as to interstate drivers when a Federal standard for maximum hours of service was put into effect. But the Court also held that,

> Plainly Congress by mere grant of power to the Interstate Commerce Commission did not intend to supersede state police regulations established for the protection of the public using state highways.

306 U.S. at 85, 59 S.Ct. at 441. Thus, *Welch* decides that state regulations limiting the hours interstate bus drivers may operate could be enforced where the ICC-DOT had not exercised jurisdiction on the same subject matter, assuming the state has a legitimate interest in establishing that control.

Since the record and briefs do not bring before us any regulation of the ICC-DOT establishing maximum hours

---

12. At the time § 13(b)(1) of the FLSA, 29 U.S.C. § 213(b)(1), was adopted, Senator Black said:

> It is my belief that it would be certainly unwise to have the hours of service regulated by two governmental agencies. I am further of the opinion that the Interstate Commerce Commission, since it has the power and has exercised it, should be the agency to be entrusted with this duty. 81 Cong.Rec. 7875, 75th Cong., 1st Sess. July 30, 1937.

> See, also Southland Gasoline Co. v. Bayley, 319 U.S. 44, 48, 63 S.Ct. 917, 919, 87 L.Ed. 1244 (1943):

> The amendment was adopted to free operators of motor vehicles from the regulation by two agencies of the hours of drivers.

13. See 112 Cong.Rec. 750 (1966) (Senator Javits "this proposal really amounts to a State minimum wage law"; Senator Morse concurs.)

14. Morris v. McComb, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947); Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 91 L.Ed. 1158 (1947); Pyramid Motor Freight v. Ispass, 330 U.S. 695, 67 S.Ct. 954, 91 L.Ed. 1184 (1947).

of the Company's bus drivers for the period in question, we have no basis for finding a termination of the State's concurrent jurisdiction. Even if there were such a regulation, there is no necessary inconsistency between an ICC-DOT regulation limiting maximum hours for safety reasons, and a state statute, passed as an economic regulation, for overtime pay within those limitations. "There is no necessary inconsistency between enforcing rigid maximum hours of service for safety purposes and at the same time, within those limitations, requiring compliance with the increased rates of pay for overtime work done . . . ." Levinson v. Spector Motor Service, 330 U.S. 649, 661, 67 S.Ct. 931, 939, 91 L.Ed. 1158 (1947). The state may e. g., have an interest in creating job opportunities by overtime compensation even though extra hours may be worked without danger to the public.

It may be that a State overtime pay provision might have to be suspended or terminated as an interference with an ICC-DOT regulation, or as a burden on interstate commerce, but any such contention would have to be supported by an express DOT determination, or a factual showing of burden, and not by abstract conception. In general a state's law is given effect unless it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

3. The DCCA concluded that since the D.C.Act is to be considered like any State law, its coverage extends "only to those individuals working entirely within the District of Columbia" and is inapplicable to any bus drivers in interstate commerce.

■ The DCCA was certainly correct insofar as its approach sought some territorial limitation on the definition of employer and employee. That is impli-

cit in any state law, and in the finding in D.C.Code § 36–401 (*supra,* note 4) that there is need for protection of persons employed in "occupations in the District of Columbia." But we see no warrant for saying that a person is not employed in the District of Columbia unless he is "working entirely within the District of Columbia." The legislative history references cited in footnote 10 of the DCCA's opinion do not impel such a conclusion.[15] The D.C.Minimum Wage Board and the Corporation Counsel have interpreted the law to apply though some work is done outside the District. These rulings are entitled to weight as construction of the District of Columbia Code unless plainly unreasonable or contrary to ascertainable legislative intent.

The opinion of the Corporation Counsel rendered to the Board on March 17, 1969, related to three employers who maintain offices in the District—a furniture retailer; a floor covering company; and a motor bus company—and held the overtime compensation provisions of the D.C.Act applicable to motor vehicle drivers "who perform services, in varying degree, in the nearby areas of Virginia and Maryland." The opinion states that "overtime compensation is required regardless of whether the employee performs some portion of his duties outside the District.

The Corporation Counsel has filed a brief amicus curiae asking that the DCCA ruling be reversed because its effect is to remove from the Act "many thousands of employees who are employed in the District of Columbia but whose employment duties require them to go occasionally into the neighboring jurisdictions of Maryland and Virginia."

Defendant Company stresses that its case, unlike the employers referred to in the opinion of the Corporation Counsel, relates to employers maintaining premises in the District. While plaintiffs argue to the contrary, we think this has

---

15. Thus all we discern in 112 Cong.Rec. at 25160, is a reference by Senator·Morse to protection of the "workers in this com-

munity," and to his belief that not many employers will "move to the suburbs" on account of this legislation.

some materiality in giving content to the concept of persons "employed . . . in the District of Columbia." [16] But that cannot be conclusive. Would an employee working full-time in the District of Columbia, except for checking in and out of his home office, be exempt because his employer's business locations were entirely in Maryland? Would he fail of coverage if 10% of his time were spent in Maryland? Is he not, in every meaningful sense of the term, employed in the District?

■ The supplemental inquiry we caused to be made (*supra* note 9) reveals a lack of state rulings concerning the problem of persons working in more than one state. Plaintiffs apparently contend that if an employer has enough presence in the District of Columbia to be subject to process here, and to be subject to its licensing and tax laws, it is also subject to the minimum wage law—even as to employees who perform only, say 5% of their services in the District of Columbia. This contention has conceptual symmetry, but exceeds, we think, the likely sense of Congress, and we reject it. In recent years, by legislation and court decisions, foreign corporations have been held to be doing business, for purposes of service of process, on narrow grounds involving a bare minimum of contacts, in order to accord a forum of litigation that is reasonably convenient to persons involved with the corporation even in isolated or occasional transactions. And even relatively minimal contacts with a state may mean exposure to licensing jurisdiction, for protection of the public, and to tax liability. But the fact that a corporation's transactions and contacts with a jurisdiction subject it to litigation in that forum, or perhaps other regulatory controls, does not subject it to minimum wage controls for any employee it happens to bring into the jurisdiction

to handle or service the transaction. The considerations are entirely different.

At the end of the road we are left to interpret the concept of "employed . . . in the District of Columbia" for purposes of the D.C. minimum wage law, and its overtime compensation provisions, without any significant aid from legislative history or implementing regulations. We are in effect left, as we put it in District of Columbia v. Orleans, 132 U.S.App.D.C. 139, 406 F.2d 957 (1968), with the task of projecting how the legislature would have dealt with the concrete situation before us if it had but spoken more completely. In our interpretation, we take guidance not only from the ordinary and natural meaning of the term "employed . . . in the District of Columbia," but also from the practicalities of the situation, which require a reasonably commonsense rule which can be applied with reasonable simplicity by area businessmen.

We are of the view that the ordinary and natural meaning of the term "employed . . . in the District of Columbia" encompasses an employee who regularly spends more than 50% of his work time in the District. We are also of the view that if an employer has so organized work that an employee does not regularly spend 50% of his work time in any particular state (or the District), then he is considered "employed in the District" if his employment is based in the District of Columbia and he regularly spends a substantial amount of his working time in the District. We stress the feature of regularity; an employee does not lose his status of being employed in the District merely because he receives an assignment, for a relatively short period, that calls on him to spend all his time for that period at some location outside the District. Otherwise, that status would be lost or suspended

16. For one thing, the D.C.Act authorizes the D.C.Commissioner(s) to enter on and inspect the place of business of any employer in the District of Columbia, see D.C.Code § 36–405.

The employer is required to keep a copy of the law or any regulation or order issued under it, posted "in a conspicuous and accessible place in or about the premises wherein any employee covered by such regulation or order is employed." D.C.Code § 36–412.

through relatively isolated or occasional employment outside the District, and from the common sense of the matter we conclude that this is not the legislative intent.

Thus, the term "employed . . . in the District" applies, even though the employment is based outside the District (e. g., employer's offices, place of reporting for duty), if the employer's work is organized in such a way that there are employees who regularly spend the bulk of their working time in the District. This condition identifies the substantial interest of the District in enhancing wages and job opportunities, and also brings into play the express purpose of the Act to preclude competitive disadvantages from hurting employers in compliance.

Since in general the plaintiff bus drivers are based outside the District, spend only 38% of their total pay time within the District, and are rotated among routes rather than segregated by routes, it seems unlikely that plaintiffs can obtain the recovery they seek. However, the present record does not permit us to dispose of the case definitively. We remand for a determination whether the Company has so organized its work that there are bus drivers who regularly spend more than 50% of their workweek in the District of Columbia. If there are such employees, we conclude that they are entitled to the benefits of the D.C. Act.

\* \* \*

We are aware that the DCCA now has final authority to interpret a D.C. enactment. We think it appropriate on our part to express our considered view concerning a problem that was brought up for review in 1970 because of the implications of federal authority and legislation, even though our ruling was, regrettably, delayed. As to the case at bar, our order will provide for vacation of the judgment of the DCCA and remand for further proceedings not inconsistent with this opinion.

So ordered.