*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-AA-0194

ECKINGTON HOUSE MENTAL HEALTH SERVICES, LLC, PETITIONER,

v.

OFFICE OF WAGE-HOUR, *et al.*, RESPONDENTS.

On Petition for Review of a Decision of the
Office of Administrative Hearings
(2022-OWH-00005)

(Hon. Margaret A. Mangan, Administrative Law Judge)

(Submitted March 27, 2024          Decided November 13, 2025)

*Theodore Bruce Godfrey* was on the brief for petitioner.

*Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Carl J. Schifferle*, Deputy Solicitor General, and *Lucy E. Pittman*, Senior Assistant Attorney General, were on the brief for respondents.

Before BECKWITH and HOWARD, *Associate Judges*, and WASHINGTON, *Senior Judge*.

HOWARD, *Associate Judge*: Petitioner, Eckington House Mental Health Services, LLC (Eckington), seeks review of a February 10, 2023, Office of

Administrative Hearings (OAH) "Order Granting Reconsideration in Part," to the extent the order confirmed OAH's Final Order upholding a determination by respondent the Office of Wage-Hour (OWH) that claimant/respondent Regina Kennedy was an employee of Eckington within the meaning of the District of Columbia Minimum Wage Act (DCMWA), and that Eckington must pay Ms. Kennedy overtime wages and treble damages. Eckington contends that the relevant record evidence established that Ms. Kennedy performed work for Eckington as an independent contractor. Eckington's brief also suggests that Ms. Kennedy was not covered by the overtime-wage requirement because she provided "professional" services. We affirm OAH's order.

## I.  Background

Eckington provides habilitative, supportive living, and personal care for individuals with intellectual and developmental disabilities.[1] It delivers these services through the work of a pool of approximately thirty "Direct Support Professionals" (DSPs). Ms. Kennedy worked for Eckington as a DSP from August 2020 to May 2021. In June 2021, she submitted a complaint to OWH alleging that

---

[1] These services are funded through the Medicaid home-and-community-based services waiver program pursuant to a contract with the District of Columbia Department of Disability Services and the Department of Health Care Finance.

from November 26, 2020, through May 21, 2021, she worked for Eckington more than forty hours per week, but that Eckington failed to pay her overtime wages. On February 7, 2022, OWH issued a Revised Initial Determination in which it found that Eckington violated the DCMWA by failing to pay Kennedy overtime wages for the period alleged. OWH determined that Eckington owed Kennedy $3,011.75 in unpaid overtime wages and $9,035.25 in liquidated damages; OWH also assessed a $22,850 penalty to be paid to the District.

Eckington appealed that ruling to OAH. After an evidentiary hearing, the OAH Administrative Law Judge (ALJ) upheld the findings that Eckington owed Kennedy those amounts in unpaid overtime wages and liquidated damages, as well as the penalty. Eckington sought reconsideration and the ALJ determined that, pursuant to OAH Rule 2022,[2] OWH was required to make a record in support of the penalty it sought and that it failed to put on evidence in support of the remedy. Consequently, she upheld the award of unpaid overtime wages and liquidated damages but reversed the penalty assessment in her Order Granting Reconsideration in Part.

---

[2] Reflecting the D.C. Administrative Procedure Act's requirement that the proponent of an order bears the burden of proof. *See* D.C. Code § 2-509(b).

Eckington then timely petitioned for review. Eckington asks this court to overturn the determination of OAH that Ms. Kennedy was an employee during the relevant times and the award of unpaid overtime wages and liquidated damages.

## II. Standard of Review

"[T]o be affirmed on appeal, (1) [OAH's] decision must state findings of fact on each material, contested factual issue; (2) those findings must be based on substantial evidence; and (3) the conclusions of law must flow rationally from the findings." *Black v. D.C. Dep't of Hum. Servs.*, 188 A.3d 840, 848 (D.C. 2018) (internal quotation marks omitted) (quoting *Yates v. U.S. Dep't of the Treasury*, 149 A.3d 248, 250 (D.C. 2016)). "Factual findings are supported by substantial evidence when there is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. D.C. Dep't of Emp. Servs.*, 268 A.3d 827, 830 (D.C. 2022) (internal quotation marks omitted) (quoting *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180 (D.C. 2006)). Whether OAH interpreted the law correctly, such as applying the appropriate test to determine whether a worker is an employee, is a legal question that this court reviews de novo. *Wright v. Off. of Wage Hour*, 301 A.3d 660, 678 (D.C. 2023) (reviewing an ALJ determination of employee classification "[e]xercising de novo review and applying the tests we adopted in *Steinke*[]. . ."); *see also Steinke v. P5 Sols., Inc.*, 282 A.3d 1076, 1083 (D.C.

2022); *Shea Yeleen Health & Beauty, LLC v. Off. of Wage-Hour*, 343 A.3d 551, 558 (D.C. 2025) ("We review legal questions de novo."); *Hickey v. Bomers*, 28 A.3d 1119, 1126-27 (D.C. 2011) (Applying de novo review to employee classification under the D.C. Unemployment Compensation Act, based on the ALJ's findings reviewed for support by substantial evidence. Also "review[ing] *de novo* OAH's legal conclusion about whether a terminated employee's actions constituted misconduct.").

### III. Discussion

Eckington asserts what we perceive as two primary arguments in urging us to overturn the determination of OAH. First, it argues that OAH erred in classifying Ms. Kennedy as an employee by misinterpreting the law to not give appropriate weight to Eckington's belief that the parties mutually intended to form an independent contractor relationship—and in not recognizing its lack of control over Ms. Kennedy. Next, Eckington suggests, in the alternative, that the minimum-wage requirements should not apply because Ms. Kennedy falls into an exception under the act because she provided services that the D.C. Department on Disability Services' Health Home and Community-Based Services Waiver regulations recognizes as direct-support "professional" services. *See* 29 D.C.M.R. § 1906; *see also* D.C. Code § 32-1004(a)(1) (establishing the exception to the DCMWA

overtime-wage requirement for employees employed "in a bona fide . . . professional capacity").

As a preliminary matter, Eckington did not raise its alternative argument that Ms. Kennedy fell into the exception it now claims at the administrative level; thus, it failed to preserve the argument. *Hill v. D.C. Dep't of Emp. Servs.*, 717 A.2d 909, 912 (D.C. 1998) ("[a]dministrative and judicial efficiency require that all claims be first raised at the agency level to allow appropriate development and administrative response before judicial review." (quoting *Hughes v. D.C. Dep't of Emp. Servs*, 498 A.2d 567, 570 (D.C. 1985))). Accordingly, we will not entertain a claim not previously raised before OAH. *See id.*

As to Eckington's claim that OAH misclassified Ms. Kennedy as an employee, we are unpersuaded and affirm OAH's ruling.

### A. Ms. Kennedy Was an Employee Under the DCMWA

The DCMWA, D.C. Code §§ 32-1001 to 1015, provides generally that:

> No employer shall employ any employee for a workweek that is longer than 40 hours, unless the employee receives compensation for employment in excess of 40 hours at a rate not less than 1 1/2 times the regular rate at which the employee is employed.

D.C. Code § 32-1003(c). In enacting this overtime-wage requirement, the Council of the District of Columbia found that persons employed in the District "should be

paid at wages sufficient to provide adequate maintenance and to protect health" and that insufficient wage-rates "threaten[] the health and well-being of the people" and "injure[] the overall economy." D.C. Code § 32-1001(a).

The DCMWA defines the term "employee" broadly as "any individual employed by an employer," D.C. Code § 32-1002(2),[3] and defines "employer" to include "any individual, partnership, general contractor, subcontractor, association, corporation, business trust, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 32-1002(3). The term "employ" is defined as "suffer or permit to work." *Id.* § 32-1002(1A).

This court has not previously construed the term "employee" as used in the DCMWA as it relates to persons who work full-time in the District of Columbia.[4] We have, however, construed the similarly broad definition of "employee" in the

---

[3] This definition has been described as "generally unhelpful, . . . completely circular and explaining nothing." *Perez v. C.R. Calderon Constr., Inc.*, 221 F. Supp. 3d 115, 140 (D.D.C. 2016).

[4] In *Williams v. W.M.A. Transit Co.*, 268 A.2d 261, 262 (D.C. 1970), we did address whether an individual who is engaged in interstate commerce as a bus driver and works part of his time in the District of Columbia is an "employee" within the scope of the version of the minimum-wage statute then in effect.

Wage Payment and Collection Law (WPCL), D.C. Code § 32-1301 *et seq*. *See, e.g.*, *Wright*, 301 A.3d at 684 (quoting *Steinke*, 282 A.3d at 1083 (broadly construing the term to serve the remedial purpose of the District of Columbia's wage laws)). Moreover, consistent with the reference to the Fair Labor Standards Act (FLSA) in Section 32-1004(a)(1), federal courts in our jurisdiction have looked to case law construing the FLSA for guidance as to who is an "employee" within the meaning of the DCMWA. *See, e.g.*, *Escamilla v. Nuyen*, 227 F. Supp. 3d 37, 52 n.4 (D.D.C. 2017) ("The DCMWA's overtime requirement is almost identical to the overtime requirement included in the FLSA. . . . Therefore, the [c]ourt finds that liability under the FLSA for overtime wages automatically triggers the overtime violation under the DCMWA.") (citing *Williams v. W.M.A. Transit Co.*, 472 F.2d 1258, 1260-61 (D.C. Cir. 1972)); *Del Villar v. Flynn Architectural Finishes, Inc.*, 664 F. Supp. 2d 94, 96 (D.D.C. 2009) (observing that the FLSA and DCMWA "are interpreted similarly"). The DCMWA, the FLSA, and the WPCL "are 'construed consistently' for the purpose of assessing the category into which an employee falls." *Medina v. Kevorkian Cleaning Co.*, 444 F. Supp. 3d 204, 212 (D.D.C. 2020); *Perez*, 221 F. Supp. 3d at 138 (same); *see also Sanchez*, 322 A.3d at 537 (observing that "[DC]MWA claims resemble WPCL and FLSA claims regarding uncompensated work" and agreeing that "[t]he legal standards for the overtime provisions of the

[FLSA and the DCMWA] are essentially identical") (quoting *Rodriguez v. Adams Rest. Grp.*, 308 F. Supp. 3d 359, 363 (D.D.C. 2018)).

In *Steinke*, this court adopted the "economic reality" test established under the FLSA for determining the appropriate classification of employee or independent-contractor status under the WPCL. *See Wright*, 301 A.3d at 678 (quoting *Steinke*, 282 A.3d at 1085). That test, which is also appropriate under the DCMWA, considers the following factors:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
>
> 2) the alleged employee's opportunity for profit or loss depending upon h[er] managerial skill;
>
> 3) the alleged employee's investment in equipment or materials required for h[er] task, or h[er] employment of workers;
>
> 4) whether the service rendered requires a special skill;
>
> 5) the degree of permanency and duration of the working relationship;
>
> 6) the extent to which the service rendered is an integral part of the alleged employer's business . . .
>
> [7] whether or not the work is a part of the regular business of the principal . . . [;]
>
> [8] whether or not the parties believe they are creating the relationship of employer-employee[.]

*Wright*, 301 A.3d at 678; *see also Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311-12 (5th Cir. 1976) (FLSA case explaining that "the final and determinative question must be whether the total[ity] of the [circumstances considered] establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of the FLSA or are sufficiently independent to lie outside its ambit."). No one of the foregoing factors (to which we refer hereinafter as the *Steinke* factors) is dispositive standing alone. *Wright*, 301 A.3d at 678.

Upon our review of the record, we are satisfied that OAH's findings of fact are supported by substantial evidence in the record and that the ALJ's conclusions of law flow rationally from her factual findings. Reviewing the ALJ's application of the law de novo, we conclude that the ALJ appropriately considered each of the *Steinke* factors. We therefore cannot say that the ALJ erred in concluding that, on the record evidence, most of the factors weighed in favor of classifying Ms. Kennedy as an "employee." Because Eckington focuses primarily on the eighth *Steinke* factor, we begin our analysis there before turning to the remaining factors.

### 1. The ALJ properly considered the eighth *Steinke* factor

As described above, Eckington's primary contention in its brief to this court is that Ms. Kennedy and Eckington "enjoyed the benefits of [a negotiated,] independent contractual relationship," which "OWH should not have altered and

rewritten." Eckington argues that this factor as discussed in *Steinke*—whether Ms. Kennedy and Eckington "believe[d] they [we]re creating the relationship of employer-employee"—"overshadow[s]" the other seven *Steinke* factors. However, as we have emphasized (and as Eckington acknowledges), none of the factors standing alone is dispositive. *See Wright*, 301 A.3d at 678.

In looking at whether or not the parties believed they were creating the relationship of employer-employee, OAH considered the terms of Ms. Kennedy's offer letter, also described as a notice of hire letter. The letter clearly identified Ms. Kennedy as a "1099 Independent Contractor." However, OAH noted the letter also "set a[n] hourly wage and provided for permanent employment, which both suggest [Ms. Kennedy] was an employee." The ALJ continued beyond the letter and specifically considered whether Ms. Kennedy "agreed to be an independent contractor" and ultimately rejected Eckington's claim that she did.

As the ALJ aptly noted, the evidence established that Ms. Kennedy "passively went along with the [notice-of-hire and tax] forms provided to her by [Eckington] that identified her as an independent contractor" who would receive a Form 1099. Ms. Kennedy testified that she was not sure that she received the notice of hire letter stating that she would be "a 1099 Independent Contractor" and would be ineligible for overtime, explaining that she was told "in person" that she was hired. The ALJ

stated in her analysis that Ms. Kennedy "signed" the notice of hire letter; we note, however, that Eckington's program director testified that Ms. Kennedy did not sign the letter, and no copy with her signature was presented in evidence.

In addition, Ms. Kennedy testified that when she was first hired, her Eckington supervisor, Patricia, told her that she would be eligible for overtime and encouraged her to give up the other jobs she had at the time she was hired so that she "would receive more hours" with Eckington. Moreover, Ms. Kennedy testified that her pay was deposited directly, and she did not receive paystubs—which would have shown the absence of tax withholding and of overtime pay—as a result she did not become aware that she was being treated as "a 1099 employee" until "around tax time." Further, Ms. Kennedy's testimony supports the ALJ's finding that "she did not understand the difference between a 1099 and a W-2 tax form." Thus, her several-month delay in filing her overtime claim did not compel a conclusion that she agreed to independent-contractor status, contrary to Eckington's assertion.

Considering that Ms. Kennedy did not understand the implications of being a 1099 worker or the difference between that and a W-2 employee, either due to misrepresentations made to her by Eckington, even if by mistake or error, or through her own lack of expertise, it would be difficult to conclude that she knowingly

entered an independent contractor relationship with Eckington sufficient to satisfy the eighth *Steinke* factor.

Nonetheless, Eckington continues to assert on appeal that its New Hire letter indicated that the offer it made was to hire Ms. Kennedy as an independent contractor, which it believes should control. Although Ms. Kennedy's New Hire letter labeled her as an independent contractor, which the ALJ noted in her analysis, the contractual terms of employment between an employer and a worker do not exist in a vacuum, outside of other facts relevant to the parties' beliefs regarding their relationship. The independent contractor label conflicts with the terms outlining Ms. Kennedy's open-ended employment and minimum wage, as well as with Ms. Kennedy's own understanding of her employment. These facts give support to OAH's determination that the letter alone does not determine the parties' beliefs under *Stienke's* eighth factor. That determination is also consistent with the D.C. Circuit's application of our economic realities test. *See Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 397-98 (D.C. Cir. 2024) (analyzing a worker's classification under the WPCL using this court's economic reality test from *Wright* and *Steinke* and stating "[t]he economic reality inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship." (citation omitted)); *see also Morrison v. Int'l Programs Consortium, Inc.*, 253 F.3d 5, 11

(D.C. Cir. 2001) ("Facile labels and subjective factors, however, are only relevant to the extent that they mirror economic reality.") (citation modified).

Eckington's label, on its own, no more establishes this factor or absolves it of potential misclassification than a declaration that NBA legend Muggsy Bogues[5] can dunk a basketball could establish that he did in an NBA game[6]—such a claim points to the possibility, but does not establish the reality on its own. Each of the *Steinke* factors, including factor eight, seek to consider aspects that contribute to describing the economic reality of the employer-worker relationship—none are mere check-boxes. *See Wright*, 301 A.3d at 678; *Steinke*, 282 A.3d at 1084-85. Therefore, neither this court nor OAH is obliged to agree with Eckington's assertion that, regardless of Ms. Kennedy's actual understanding or potential agreement regarding her employment status, it is decisive that the terms of her New Hire letter "made clear from the beginning that" her work with Eckington was "that of an independent contractor."

---

[5] The shortest player in NBA history, at five-foot, three inches tall, whose prolific career began with the Washington Bullets. *Muggsy Bogues*, NBA, https://www.nba.com/stats/player/177/career; https://perma.cc/87GY-EUGE (last visited August 28, 2025).

[6] *See* Muggsy Bogues Player Profile, https://www.basketball-reference.com/players/b/boguemu01.html; https://perma.cc/H6FP-NRGN (last visited September 18, 2025) (reflecting no recorded dunk in a game).

As a result, we conclude that OAH's determination flowed rationally from its findings. OAH's determination that Ms. Kennedy did not personally believe she entered an independent contractor relationship with Eckington supports the conclusion that the offer letter's independent contractor label does not control the parties' beliefs here.

### 2. The ALJ properly considered each of the other *Steinke* factors

Looking to the ALJ's application of the law on the remaining factors, we readily conclude that the ALJ's thorough analysis properly considered each of the other *Steinke* factors, was supported by substantial evidence, and the ultimate conclusion that Ms. Kennedy should be classified as an "employee" flows rationally from the ALJ's findings.

Beginning with the first *Steinke* factor, the ALJ found that Eckington exercised "a substantial degree of control over the way [Kennedy] performed her work." The record supports the ALJ's findings: that although Ms. Kennedy advised Eckington of the days and hours she was available to work, Eckington "assigned to specific time and location" of Ms. Kennedy's work, and Ms. Kennedy was "expected to notify [Eckington] of any instance [in] which she could not fulfill the coverage as assigned or if she was running late for an assignment." Additional evidence that Eckington exercised control over the way Ms. Kennedy performed her

work was the testimony by Ms. Kennedy that she looked to Gary Trisdale, Eckington's house manager/nurse, for guidance and advice on "redirecting" the developmentally disabled residents for whom Ms. Kennedy provided support in the Eckington facilities.

Eckington argues that Ms. Kennedy's work for at least two other care facilities that were "apparent . . . horizontal competitors of Eckington House in its service lines[]" while concurrently working for Eckington shows that she was "free to make these choices independently" and is evidence in favor of her independent contractor status. Eckington is not specific about which *Steinke* factor it believes this relates to and this court has not yet considered what effect working for multiple putative employers has on a worker's relationship with a single putative employer. We think a natural reading of the argument, especially Eckington's emphasis on Ms. Kennedy's freedom to make choices independently, lends itself toward the nature and degree of control factor of the economic realities test. Other courts have considered such arguments similarly. *See Dole v. Snell*, 875 F.2d 802, 808 (10th Cir. 1989) (holding that cake decorators who could decorate cakes for third parties did not preclude their employee status under the control factor); *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 813-14 (6th Cir. 2015) (listing worker's ability to work for other companies as a consideration under the right to control factor); *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) (applying the

right to control factor to determine what effect working for the putative employer's competitor has on the worker's employment status).

Eckington's argument is not entirely persuasive. At best it relates to a relatively minor aspect of control, which we do not necessarily see as a two-way ratchet. If Eckington were to prevent Ms. Kennedy from working for any other employer that would certainly be powerful evidence of her status as an employee under this factor. However, the converse is not so true. As a matter of logic, if someone were to work as an employee delivering pizzas for the D.C. area's Ledo Pizza and were scheduled part-time, nothing—outside of a valid non-compete agreement or contractual restriction—would reasonably prevent that person during their free time from delivering pizzas for another business such as Wiseguy Pizza, Manny & Olga's Pizza, or Pizza Boli's. In normal circumstances we would expect an employee or independent contractor to be able to monetize their free time as they see fit. The absence of Eckington seeking to exert additional control is not evidence of the absence of control.

Considering the second *Steinke* factor, the ALJ found that Ms. Kennedy had no opportunity for profit or loss depending on her managerial skills; rather, the undisputed evidence was that she was paid a fixed hourly wage, and the pay

documents entered into evidence showed no bonus payments for performance or decision making.

As to the third factor, the ALJ correctly observed that no evidence was presented that Ms. Kennedy "supplied the equipment required for caring for the clients." Petitioner does not dispute this finding by the ALJ.

Citing the next *Steinke* factor, the ALJ further noted the evidence that Ms. Kennedy had to complete in-service training (by Eckington) "to address the unique support needs of the person, as detailed in his or her ISP [Individual Support Plan]," further supported her employee status. Ms. Kennedy acknowledged in her testimony that Eckington staff "coached" or "trained" her. And, although to work as a DSP Ms. Kennedy was required to have a high school diploma or GED, first aid and CPR certification, English communication skills, and pre-service training to meet Department of Disability Services requirements, the ALJ reasonably found that these "do not rise to the level of expertise present in *Steinke.*" The ALJ also noted, as "[a]nother indicator that the skills were not specialized," that [Ms. Kennedy] was compensated as a minimum wage worker—a finding that is supported by the record. Ms. Kennedy's "New Hire" letter specified that she would be paid at the rate of $15.00 per hour, which was the minimum wage in 2020 when she began work for Eckington. *See* D.C. Code § 32-1003(a)(5)(v).

Considering the fifth *Steinke* factor, the ALJ further found, and the New Hire letter supports, that there was no pre-limitation on the duration of Ms. Kennedy's working relationship with Eckington. In addition, considering what we have identified as the sixth and seventh *Steinke* factors, OAH found that the work Ms. Kennedy performed was "the very service offered by [Eckington]" and "the most integral part" of its business, circumstances that "heavily favor[ed]" a finding that Ms. Kennedy was an employee within the meaning of the DCMWA.

On review we determine that the ALJs findings of fact are supported by substantial evidence in the record, the ALJ appropriately applied the law, and the ALJ's conclusions flow rationally from her findings. We affirm the determination of the ALJ that Ms. Kennedy was an employee under the DCMWA.

## IV.    Conclusion

For all the foregoing reasons, the OAH's Order Granting Reconsideration in Part is affirmed.

*So ordered.*